IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMBER HUDSON, | ) | CASE NO. 1:11 CV 2633 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) ) | MEMORANDUM OPINION |

This matter is before the Court on Defendant, Norfolk Southern Railway Company's Motion for Partial Summary Judgment. (ECF #19). Plaintiff, Amber Hudson, filed a complaint against Norfolk Southern Railway Company ("Norfolk") alleging negligence pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, and a violation of the Federal Safety Appliance Act ("FSAA"), 49 U.S.C. §20301, *et seq.*, and related federal regulations found at 49 CFR Part 231. Defendant seeks summary judgment in its favor on the claim arising under the FSAA and related regulations. Plaintiff filed a Response to the Defendant's motion; Defendant filed a Reply; and, Plaintiff responded with a Sur-Reply after

seeking permission from the Court. (ECF #22, 23, 24-1). The issues have been fully briefed and are now ready for disposition. For the reasons set forth below, Defendant's Motion for Partial Summary Judgment is GRANTED.

## Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

-2-

evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d

222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## **Facts**[1]

Ms. Hudson claims that she was injured when she was descending a side ladder on a railcar at Norfolk Southern's Elyria Yard. She claims that while stepping down from the ladder, she slipped when the ballast (stone and gravel around the base of the railroad tracks) shifted under her foot and she lost her balance. As a result, she suffered an injury to her back.

The injury occurred on January 16, 2011, around 1:30 a.m., while Ms. Hudson was

---

[1] The facts are viewed in the light most favorable to Ms. Hudson, the non-moving party. Unless otherwise stated, the facts as presented have been taken from those facts within Plaintiff's Response to Defendant Norfolk Southern Railway Company's Motion for PartialSummary Judgment that have evidentiary support, and from Plaintiff's own deposition testimony.

-4-

working as a conductor on a railroad job. (ECF #22-1: Hudson Depo. p. 36, 38). Ms. Hudson testified that as a conductor, her duties included, among other things, releasing and setting handbrakes on railcars, climbing on and off railcars, and working outside during inclement weather. (*Id*. at 31-32). She had been trained on, and was familiar with the Norfolk Southern Safety Rules that addressed the setting and releasing of handbrakes, and climbing/descending railcars. (*Id*. at 31). She testified that she knew the duties of her job well as a result of her training. (*Id.* at 33).

The job at issue included picking up cars at the Norfolk Elyria Yard. *(Id*. at 36). In order to remove the cars being picked up from the Elyria yard, Plaintiff had to release the handbrakes on each of the cars. (*Id*. at 47-48). This was done by climbing up a ladder onto the brake platforms of each car, turning the brake wheel to release the brakes, and then descending down a ladder to return to the ground. (*Id*.). Each of these functions was part of her general duties as a conductor; each was a function she had been trained to do; and, she was familiar with and had been briefed on Norfolk's safety rules relating to each of these functions. (*Id.* at 31-36, 38, 43-45). Ms. Hudson had been performing these duties (setting and releasing handbrakes, and ascending and descending railcar ladders) "pretty much all night" in the South Lorain yard before heading to the Elyria yard. *(Id.* at 44-45).

Ms. Hudson was familiar with the Elyria yard and the specific track or "pocket" where the cars were located on the night of her injury. (*Id*. at 33-35, 37). There was nothing out of the ordinary about the duties she performed that night. (*Id*.). She had never had any problems or injuries in that yard before, and had no complaints about working in that yard. (*Id*. at 35).

On January 16, the day of the injury, the weather was cold and there was light snow on

-5-

the ground. (*Id*. At 40-41). Ms. Hudson wore her work boots and safety boots that Norfolk provided when there was snow or ice outside. (*Id.* at 41). She testified that when she threw the crossover switch before attempting to release the three railcars, she "took a little hammer with me. Being that cold and they are out there, sometimes locks stick." (*Id*. at 46). When Ms. Hudson attempted to release the handbrakes on the three railcars that day, the brake wheels would not turn. (*Id*. at 47-48). Ms. Hudson concluded that the handbrakes may have been frozen due to the cold weather. (*Id.* At 47-48). She also speculated at some point that they could have been stuck due to chains. (*Id*. at 47). When attempting to release the handbrakes, Ms. Hudson climbed each railcar via a side ladder, and descended each car by the same means without incident. (*Id*. at 64). She also checked the railcars for any deficiencies or defects as she is required to do by Norfolk's safety rules. (*Id*. at 68). She noticed no problems with the cars. (*Id*.).

Ms. Hudson describes the events leading up to the injury as follows:

She went up the third car to release the brake. *(Id.* at 47). In doing so, she noticed that there was a slope going up to that rail car, therefore, she was extra careful going up. *(Id.* at 47). She climbed onto the railcar and tried to release the brake, but it would not come off. *(Id.* at 47). She came down from this railcar and went to the second one. *(Id.* at 47). She couldn't get the brake off on that railcar either. *(Id.* at 47). She came down from the second railcar and went to the first. *(Id.* at 47). The handbrake on the first railcar also would not release. *(Id.* at 47). Before descending from the first railcar she tried to loosen the brake using a hammer "to bang it around." *(Id.* at 47). This did not free the handbrake. *(Id.* at 47). She then descended the first car, climbed back up on the second car and attempted to free that brake with the hammer. *(Id.* at

-6-

47). It loosened but did not release. *(Id.* at 47). She descended the second railcar and returned to the third. *(Id.* at 47). She climbed back up the third railcar and used the hammer to loosen that handbrake. *(Id.* at 47). This time the handbrake on the third railcar did release. *(Id.* at 47). With that task completed, Ms. Hudson again descended the ladder on the third car. *(Id.* at 47). When she came down off the ladder this last time, she stepped down and the ballast beneath her feet moved, causing her to slip on the slope of the trackbed. (*Id*. at 47).

Ms. Hudson did not fall trying to release the handbrake. (*Id.* at 64). She opened it by "yanking on it in every way [she] could do safely," (*Id.* at 54), and eventually hitting it with a hammer. (*Id.* at 55). After the handbrake was released, she left the platform and had safely gotten both feet and both hands on the ladder and begun to descend from the railcar. (*Id.*). She reported no problems with the side ladder or the platform on the railcar. (*Id*. at 64). When she stepped off the ladder with her left foot, she looked and saw nothing there, but when she made that step the ballast on the track bed gave way and caused her to fall. (*Id*. at 57-60). When specifically asked what she believed the railroad had done wrong to cause her injury, she mentioned a lack of available brake sticks and the slope of the ground beneath the ladder on the third car. (*Id*. at 66, 68). She did not blame any alleged defect or inefficiency in the handbrake.

As a result of her injury, Ms. Hudson complains of constant pain in her lower back. (*Id.* at 19-24).

## **Analysis**

The FSAA does not create an independent cause of action for employees injured because of a violation of the Act. *Crane v. Cedar Rapids & Iowa City Ry. Co.*, 395 U.S. 164, 166 (1969).

A violation of the FSAA, however, can provide the basis for a FELA action. *Beissel v. Pittsburgh & Lake Erie Railroad Co.*, 801 F.2d 143, 145 (3d Cir. 1986). In order to recover for a FELA claim precipitated by a violation of the FSAA, a Plaintiff must prove (1) that the FSAA was violated, and (2) that the injuries suffered resulted in whole or in part from the defective equipment. *Lang v. New York Central Railroad Co.*, 255 U.S. 455, 458 (1921); *Norfolk Southern Railway Co. v. Sorrell*, 127 S. Ct. 799, 810 (2007); *Coray v. Southern Pac. Co.*, 335 U.S. 520, 523 (1949).

The violation alleged in this case is a failure to equip railcar NS 487837 with "efficient" handbrakes. Therefore, in order to survive summary judgment on this claim, Ms. Hudson must provide evidence that would establish or show the existence of a genuine issue of fact as to the following elements: (1) that railcar NS 487837 was not equipped with "efficient" handbrakes; (2) that she was injured; and (3) that her injuries were caused, in whole or in part, by the lack of "efficient" handbrakes. *Texler v. D.O. Summers*, 81 Ohio St.3d 677 (1998); *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142.

The parties spend a good deal of time in their briefs arguing whether the handbrakes at issue were "efficient" as required by the FSAA. They have both presented expert testimony to support their individual opinions on this matter. The Court, however, need not determine whether handbrakes that effectively stop the railcar may be deemed defective or not "efficient" because they are temporarily more difficult to release than usual, whether due to freezing temperature, overtightening, or interference with chains. Whatever the condition of the handbrakes in this case, there is no evidence whatsoever that they were the cause of Ms. Hudson's injuries.

Ms. Hudson has not provided testimony or other evidence sufficient to establish that the handbrakes on the NS 487837 railcar caused her fall, in whole or in part. She testified in her deposition that she had finished working with the handbrakes, had left the platform where the handbrakes were located, had safely stepped onto the ladder (which itself was not defective) and had stepped off the ladder onto the ballast before she fell. She, further testified that climbing on and off the ladders to reach the train platforms and return to the ground was a routine part of her job, and that she had done it a number of times that night at various locations. Further, she had repeatedly climbed and descended from the cars at issue in this case without incident on the night of her injury.

She, herself, attributed her fall to her foot giving out when she stepped down onto the ballast. (ECF #22-1, Hudson Depo. at 58). She did not blame the fall on the handbrakes, other than to say that if brake sticks had been available she might have been able to release the brakes from the ground. (*Id*. at 66-67). The only other risk factor she indicated that may have contributed to her fall was the steepness of the slope on the ground leading up to car three. (*Id*. at 68).[2] There is absolutely no evidence whatsoever that her fall was caused by any defect in the handbrakes, or that it had any relation to her use of the handbrakes. All evidence indicates that she fell on the ballast or loose rock that lines the trackbed, and that she did so while engaging in an activity that is a routine part of her job. The mere fact that a second attempt to loosen the handbrakes on railcar NS 487837 may have required her to climb the ladder one extra time that

---

[2] Ms. Hudson testified that she was aware of the steepness of the slope when she climbed the ladder on car three for the second time, and knew that she needed to be careful coming down for this reason, as well as because of the weather conditions. (ECF #22-1: Hudson Depo. at 65-66).

night, when climbing and descending the ladder was a routine part of her job and had been successfully navigated numerous times that night, is not sufficient to create a causal connection relative to her fall. Therefore, whether the handbrakes on railcar NS 487837 were "effective" or "deficient," her fall was not caused in any part by any defect in the handbrakes. The sole cause of Ms. Hudson's injury that could be supported by the submitted evidence was Ms. Hudson's loss of footing when she slipped on the rocks below the railcar.

## **Conclusion**

For the reasons set forth above, Defendant's Motion for Partial Summary Judgment is hereby GRANTED. IT IS SO ORDERED.

    /s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED:   June 18, 2013